UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X


EDGEWOOD PARTNERS INSURANCE
CENTER INC. d/b/a EDGEWOOD PARTNERS
INSURANCE AGENCY, as successor in interest to
INTEGRO USA, INC.,

                     Plaintiff,

               -against-

PPD DEVELOPMENT, L.P.,

                     Defendant.

-----------------------------------------------------------------X

22-CV-6957 (VF)

**OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge.**

Plaintiff Edgewood Partners Insurance Center Inc., as successor in interest to Integro

USA, Inc., commenced this action against Defendant PPD Development, L.P. for breach of

contract. Presently before the Court is Plaintiff's motion for leave to file a second amended

complaint. For the reasons stated herein, the motion for leave to amend is **DENIED**.

## **BACKGROUND**[1]

### A. **Factual Background**[2]

1. The Non-Disclosure Agreement

On or about June 14, 2019, Defendant PPD Development, L.P. ("PPD") entered into a

Non-Disclosure Agreement ("NDA") with Integro USA Inc., to which Plaintiff Edgewood

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the ECF-generated pagination in the cited document.

[2] The Court presumes the parties' familiarity with the relevant factual and procedural background of this case. The background information recounted herein is limited to that which is relevant to the instant motion.

Partners Insurance Center Inc. ("EPIC") is the successor in interest. ECF No. 125-2. The NDA has a stated purpose: "Whereas, the parties are interested in discussing consulting services pertaining to employee benefit plans that [EPIC] may offer to PPD . . . , and in so doing, may disclose to each other or otherwise learn from each other certain confidential and proprietary information pertaining to their respective businesses, and neither party is willing to proceed with these discussions unless they have an agreement restricting further disclosure or use of this information." Id. at 2 (emphasis omitted).

Under the NDA, "Confidential Information" is defined to include "any and all material, data, know-how and information of any kind whatsoever, provided to Receiving Party by Disclosing Party, or on behalf of Disclosing Party, or discovered by Receiving Party as a result of Receiving Party's relationship with Disclosing Party." Id. at ¶ 1. The NDA permits disclosure of "Confidential Information" by a "Receiving Party" to "its officers, directors, employees, advisors (including attorneys), agents, and othe[r] representatives . . . who have a need to know and who are bound by the confidentiality obligations." Id. at ¶ 2. The NDA requires that the Receiving Party "advise such Representatives of the Receiving Party's obligations under [the NDA]." Id.

2.  The Consulting Agreement

On or about June 19, 2019, PPD entered into a Consulting Agreement with Integro USA Inc., to which EPIC is the successor in interest. ECF No. 29-1. The Consulting Agreement states that "[PPD] wishes to obtain the assistance of [EPIC] with strategic benefit planning, design, funding, administration, and communication with respect to its employee benefit programs[.]" Id. at 2. The Consulting Agreement contains a "Complete Agreement" clause stating: "This Agreement supersedes all prior understandings, representations, negotiations and correspondence

2

between the parties, constitutes the entire agreement between them with respect to the matters described, and shall not be modified or affected by any course of dealing, course of performance or usage of trade." Id. at § 12(F). The Consulting Agreement also contained a confidentiality clause which provides that "any and all information which may be made available to or learned by [EPIC] from [PPD] . . . is to be treated by [EPIC] as strictly confidential" and "shall be used solely in connection with this Agreement and shall not be published or disclosed to any third parties except to provide the Services other than to [EPIC's] officers, directors, affiliates, advisors (including attorneys), agents, employes or subcontractor[s]." Id. at ¶ 13. The confidentiality clause limits the disclosure of the Consulting Agreement itself, stating that "this Agreement and its terms and conditions are confidential, and contain confidential and proprietary information of both [EPIC] and [PPD]," and "[n]either [EPIC] nor [PPD] shall disclose copies of this Agreement to any party for any purpose without the prior written consent of the other party." Id.

## B. **Procedural History**

EPIC initiated this action on August 16, 2022. See ECF No. 1. On August 22, 2022, EPIC filed an amended complaint, asserting two claims against PPD for breach of contract based on a failure to pay the success fee contemplated in the Consulting Agreement in Count I, and disclosure of confidential information in violation of the Consulting Agreement's confidentiality provision in Count II. See ECF No. 8 at ¶¶ 40-57. PPD filed an answer to EPIC's amended complaint on September 14, 2022. See ECF No. 16. The parties consented to the undersigned's jurisdiction on October 26, 2022. See ECF No. 20.

On November 15, 2022, PPD moved for summary judgment on both claims in the amended complaint. See ECF No. 24. On September 27, 2023, the Court issued an opinion and

3

order denying PPD's motion as to EPIC's claim of breach of the Consulting Agreement's confidentiality provision in Count II of the amended complaint. ECF No. 52 at 1. In the same order, the Court scheduled oral argument on PPD's motion for summary judgment on the breach-of-contract claim in Count I. Id. The Court held oral argument on October 16, 2023. ECF No. 53. On October 24, 2023, the Court issued an opinion and order granting PPD's motion for summary judgment on the breach-of-contract claim in Count I. See ECF No. 55.

On November 7, 2023, EPIC filed a motion for reconsideration of the Court's October 24 decision (ECF No. 61), which the Court denied on September 16, 2024 (ECF No. 80). On August 4, 2025, EPIC filed a second motion for reconsideration of the Court's October 24 decision. ECF No. 105. The Court denied the motion on December 29, 2025. ECF No. 135.

Under the operative scheduling order in this case entered on November 28, 2023, the deadline to amend the pleadings was December 22, 2023, and fact discovery closed on May 31, 2024. ECF No. 69 at ¶¶ 6(A), 8(b). On May 16, 2024, the Court granted the parties' request for an extension of the close of fact discovery to November 15, 2024. ECF No. 77. On November 13, 2024, the Court granted a further extension of the fact discovery deadline to March 17, 2025. ECF No. 82. Finally, on March 17, 2025, the Court again extended the deadline for the close of fact discovery to May 17, 2025. ECF No. 88.

On May 23, 2025, the parties filed a joint letter, indicating that discovery was substantially complete, except for a meet and confer to discuss PPD's privilege log, which PPD had produced to EPIC on May 16, 2025 (one day before the close of fact discovery). ECF No. 90. On June 25, 2025, EPIC filed a motion to compel the production of certain documents that PPD had withheld as protected by the work-product doctrine. See ECF No. 94. On July 17, 2025,

the parties informed the Court that the discovery dispute had been resolved because PPD produced the at-issue documents. ECF No. 97.

Following the Court's summary judgment decision, the only claim remaining in the case is Count II of the amended complaint, which asserts a breach of the confidentiality provision in the Consulting Agreement. On August 29, 2025, EPIC moved for leave to file a second amended complaint. ECF No. 116. EPIC seeks leave to add allegations that PPD violated the confidentiality provision in the NDA. ECF No. 117-1 at ¶¶ 4, 15, 16, 18, 43-49, 58, 59, 62-66. According to EPIC, the documents PPD produced in July 2025, after EPIC challenged PPD's withholding based on privilege, reveal breaches of the NDA that were not previously known to EPIC and thus could not have been included in the first amended complaint. ECF No. 117 at 2-4. EPIC contends that these documents, produced after the close of fact discovery, "reveal that PPD breached the NDA by disclosing EPIC's confidential information to EPIC's competitor." Id. at 2. On September 23, 2025, PPD filed its opposition to the motion for leave to amend. ECF No. 122. EPIC filed its reply brief in further support of its motion on October 6, 2025. ECF No. 125.

On October 16, 2025, the Court directed EPIC to file a supplemental letter, explaining what documents it had received after the close of fact discovery that it claimed constitute new evidence and the specific information in those documents that EPIC was relying on as new evidence in support of its new proposed theory of liability. ECF No. 126. The Court also asked EPIC to explain why it could not have asserted breach of the NDA when it filed its first amended complaint given that it had the NDA and EPIC already had facts in its possession to plead in the first amended complaint that PPD had disclosed information beyond the Consulting Agreement to EPIC's competitor. Id. On October 24, 2025, EPIC filed its supplemental letter. ECF No. 127. PPD filed a response on October 31, 2025. ECF No. 130.

**LEGAL STANDARD**

"Rules 15 and 16 of the Federal Rules of Civil Procedure set forth the standards under which a party may amend a pleading." Summerwind West Condominium Owners Association, Inc. v. Mt. Hawley Insurance Co., No. 22-CV-3165 (JPC), 2023 WL 8307561, at *3 (S.D.N.Y. Dec. 1, 2023). "In the ordinary course, the Federal Rules of Civil Procedure provide that courts 'should freely give leave' to amend a complaint 'when justice so requires.'" Williams v. Citigroup Inc., 659 F.3d 208, 212 (2d Cir. 2011) (quoting Fed. R. Civ. P. 15(a)(2)). As the Second Circuit has noted, Rule 15's "permissive standard is consistent with our strong preference for resolving disputes on the merits." Id. at 212-13 (internal quotation marks and citation omitted).

At the outset of litigation, "[a] party may amend its pleading once as a matter of course" within certain prescribed time limits. Fed. R. Civ. P. 15(a)(1). Outside those limits, a party may amend only with the written consent of the opposing party or with leave of the court. Id. at 15(a)(2). "Generally, '[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)). By itself, "mere delay" is not a sufficient basis "to justify denial of a Rule 15(a) motion[.]" Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000) (internal quotation marks and citation omitted). Absent some reason for doing so, denying leave to amend is an abuse of the district court's discretion. See Foman v. Davis, 371 U.S. 178, 182 (1962).

While Rule 15(a) permits a party to amend the pleadings, Rule 16(b) "directs district court judges to set scheduling orders limiting the time to make such amendments." Parker, 204 F.3d at 339. According to Rule 16(b), within 90 days after any defendant has been served with

the complaint or within 60 days after any defendant has appeared (whichever comes first), the district court shall enter a scheduling order setting deadlines for subsequent proceedings in the case, including a deadline for the joinder of parties and amendments to the pleadings. Fed. R. Civ. P. 16(b)(2), (3). "By limiting the time for amendments, the rule is designed to offer a measure of certainty in pretrial proceedings, ensuring that 'at some point both the parties and the pleadings will be fixed.'" Parker, 204 F.3d at 339-40 (quoting Fed. R. Civ. P. 16 advisory committee's note (1983 amendment, discussion of subsection (b))). Allowing the pleadings to be amended past the court-ordered deadline without a showing of good cause "would render scheduling orders meaningless[.]" Id. at 340 (quoting Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam)).

1. Good Cause

Where, as here, a scheduling order governs amendments to the complaint, "the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" Holmes, 568 F.3d at 334-35 (quoting Grochowski v. Phoenix Construction, 318 F.3d 80, 86 (2d Cir. 2003)); see also Sacerdote v. New York University, 9 F.4th 95, 115 (2d Cir. 2021). Thus, the Rule 16(b) standard "may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 243 (2d Cir. 2007).

"Whether good cause exists turns on the diligence of the moving party." Holmes, 568 F.3d at 335 (internal quotation marks and citation omitted). To satisfy the good-cause standard, "the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." Leonard v. Abbott Labs., Inc., No. 10-CV-4676 (ADS) (WDW), 2012 WL 764199, at *3 (E.D.N.Y. Mar. 5, 2012) (quoting Sokol Holdings, Inc. v. BMD Munai,

7

Inc., No. 05-CV-3749 (KMW) (DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2019)). "[T]he court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the complaint." Cummins, Inc. v. New York Life Ins., No. 10-CV-9252 (TPG), 2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012); Sokol Holdings, Inc., 2009 WL 2524611, at *7 (collecting cases demonstrating that good-cause standard is not met where proposed amendment rests on information that party knew or should have known prior to deadline in scheduling order).

Good cause requires a showing that the delay "stemmed from any mistake, excusable neglect, or any other factor which might understandably account for failure of counsel to undertake or comply with the Scheduling Order." Eberle v. Town of Southampton, 985 F. Supp. 2d 344, 347 (E.D.N.Y. 2013) (quoting Fermin v. Toyota Material Handling, U.S.A., Inc., No. 10-CV-3755, 2012 WL 1393074, at *3 (D.N.J. Apr. 23, 2012)). "To demonstrate good cause based on newly discovered information, a party must be able to show, *inter alia*, that the previously unknown information is the primary basis of its proposed amendment." Sec. & Exch. Comm'n v. Rio Tinto plc, No. 17-CV-07994 (AT) (DF), 2020 WL 2504008, at *11 (S.D.N.Y. Mar. 9, 2020) (internal quotation marks and citation omitted).

In exercising its discretion under Rule 16(b), the Court "may [also] consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." Eberle, 985 F. Supp. 2d at 347 (quoting Kassner, 496 F.3d at 244); see also Leonard, 2012 WL 764199 at *9 ("[T]he Court has the discretion to permit an untimely amendment where, as here, the Defendant will not be prejudiced[.]"). Even if a movant demonstrates good cause, the Court retains the "discretion to deny leave to amend for good reason, including futility, bad faith, undue delay, or undue

8

prejudice to the opposing party." <u>McCarthy</u>, 482 F.3d at 200; <u>Denis v. Home Depot, U.S.A. Inc.</u>, No. 10-CV-3227 (ADS) (SIL), 2014 WL 6632486, at *4 (E.D.N.Y. Nov. 21, 2014).

    2.  <u>Futility</u>

"It is well established that '[l]eave to amend need not be granted . . . where the proposed amendment would be futil[e].'" <u>Agerbrink v. Model Serv. LLC</u>, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016) (quoting <u>Williams</u>, 659 F.3d at 214). "A proposed amendment to a pleading is deemed to be futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis." <u>Kirk v. Heppt</u>, 423 F. Supp. 2d 147, 149 (S.D.N.Y. 2006). "The opposing party must establish that granting leave to amend would be futile." <u>Blagman v. Apple</u>, No. 12-CV-5453 (ALC) (JCF), 2014 WL 2106489, at *5 (S.D.N.Y. May 19, 2014) (citation omitted). "Like when considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor." <u>Diallo v. New York City</u>, No. 23-CV-1238 (LAP), 2025 WL 522514, at *5 (S.D.N.Y. Feb. 18, 2025) (citing <u>Agerbrink</u>, 155 F. Supp. 3d at 456).

**<u>DISCUSSION</u>**

    1.  <u>EPIC cannot establish good cause to warrant leave to amend the complaint.</u>

EPIC's motion is governed by Rule 16(b), because the deadline for leave to amend the pleadings passed on December 22, 2023 (ECF No. 69 at ¶ 8(b)), and EPIC did not file its motion until August 29, 2025 (ECF No. 116). To obtain leave to amend its complaint, EPIC must therefore show good cause for its untimely motion. It has failed to do so.

In its original and first amended complaint, EPIC alleged that PPD had disclosed confidential information. Specifically, EPIC alleged that PPD had breached the Consulting Agreement by disclosing to Brown & Brown, a competitor of EPIC, "copies of the Consulting

Agreement, claims analysis, and other associated confidential and proprietary information[.]" ECF No. 1 at ¶ 34; ECF No. 8 at ¶ 38. Given the allegation in the original and amended complaints, EPIC must have been aware, as early as August 2022, of facts supporting its contention that PPD had shared "claims analysis[] and *other associated confidential and proprietary information*" with Brown and Brown. ECF No. 1 at ¶ 34; ECF No. 8 at ¶ 38 (emphasis added). Despite this, EPIC contends that at the time of its prior pleadings, it did not have evidence to support a broader claim of disclosure, such as disclosure of EPIC's work product to a competitor in violation of the NDA. ECF No. 127 at 1-2.

EPIC argues that it has good cause for its delay because its proposed amendment is based on newly discovered evidence—namely, documents that it did not get from PPD until after the close of fact discovery that support its allegation that PPD also breached the NDA by disclosing work product to Brown & Brown. ECF No. 117 at 3-4; ECF No. 125 at 1-3. Specifically, EPIC points to two documents that it obtained after the close of fact discovery: (1) a spreadsheet that contains "EPIC's tailor-made user-friendly reporting that is not common in the industry" and "provides a competitor with details about how EPIC does its work;" and (2) a spreadsheet "specifically requested by EPIC that contains information related to an employee's contributions" to a plan, "which is not typically requested of or reported by insurance carriers." ECF No. 127 at 3; see also ECF Nos. 130-1, 130-2. The latter spreadsheet, as PPD points out, was created by United Healthcare, not EPIC, and reports data to PPD about the plan. ECF No. 130 at 1-2; ECF No. 130-2. And a review of the first spreadsheet indicates that it includes claims data, projections, and fees, which is the type of "confidential and proprietary information" EPIC alleged was improperly disclosed in its original and first amended complaints. ECF No. 130-1.

These two spreadsheets aside, it appears that EPIC had enough information prior to the deadline for amending the pleadings to assert its claim that PPD disclosed EPIC's confidential information in violation of the NDA. As PPD explains, EPIC has known for years that PPD had disclosed to Brown & Brown the data needed for Brown & Brown to review EPIC's performance fee calculation. ECF No. 130 at 1-2. For instance, in November 2021, PPD told EPIC, verbally and in writing, that it had engaged "independent actuaries" to calculate the performance fee. Id. at 2. "That same day PPD sent EPIC slides showing the actuaries' take on the calculation, and over the ensuing weeks, the parties emailed back and forth about the calculation performed by what PPD referred to as its 'external actuaries.'" Id.; see also ECF No. 130-4. Then, in May 2022, the parties met to potentially resolve their dispute, and PPD told EPIC's counsel, who represents EPIC in this litigation, that Brown & Brown would attend the upcoming dispute resolution meeting as PPD's "independent actuar[ies] assisting PPD with the financial calculations and models" concerning the fee formula. See ECF No. 130-5. And on May 23, 2022, EPIC's counsel sent an e-mail to PPD requesting "the status of the Brown & Brown financial calculations and modeling," to which PPD responded by sending EPIC the calculations prepared by Brown & Brown, including data relating to PPD's benefits plan. See ECF Nos. 130-6, 130-7. Brown & Brown participated in meetings with EPIC and PPD on May 24 and June 1, where the parties "review[ed] the calculations" of the performance fee, and Brown & Brown presented its own analysis of the formula, which necessarily required it to review the data and EPIC's claims analysis. ECF No. 130 at 2; ECF No. 130-3 at 5, 7. EPIC knew this too, as two executives discussed in an e-mail whether Brown & Brown would send the "data" underlying its analysis. ECF No. 130-8.

Additionally, on November 15, 2022, PPD filed, in connection with its motion for summary judgment, an October 27, 2021 email from PPD to Brown & Brown and that e-mail indicated that it included an Excel spreadsheet as an attachment, and the spreadsheet contained the fee calculation received from EPIC and its associated backup data. ECF No. 29-7; see also ECF No. 29 at ¶ 9. In the e-mail, PPD asked Brown & Brown to specify the "documents/reports" needed for it to perform its own "clean 3rd party review." ECF No. 29-7. Although PPD did not file the Excel spreadsheet on the docket, it produced it to EPIC, along with the e-mail, on March 11, 2025, before the start of depositions in this case. ECF No. 130 at 3; ECF No. 130-11. And the data in the spreadsheet, as PPD points out, is the same type of data—claims data, third-party fees, basic projections—that EPIC claims was disclosed in violation of the NDA. ECF No. 130 at 3; see also ECF No. 130-11.

EPIC acknowledges "[g]iven Brown & Brown's participation in the calls and PPD's refusal to provide assurances of confidentiality" that it "seemed likely" that additional information had been disclosed by PPD to Brown & Brown, but it claims that this would have only been an "an assumption." ECF No. 127 at 1. But even if true, EPIC's assumption would have been confirmed by November 2022, when PPD disclosed the October 27, 2021 e-mail which indicated that PPD was sharing with Brown & Brown EPIC's documents. See ECF No. 29-7. Indeed, EPIC concedes that from the e-mail alone it had "confirmation" that PPD had disclosed two items to Brown & Brown. ECF No. 127 at 2. Yet, despite this confirmation, EPIC did not attempt to amend its complaint then. EPIC contends that the late-disclosed spreadsheets were the "first *definitive* evidence that PPD had disclosed documents to Brown & Brown beyond an excerpt of the Consulting Agreement and a spreadsheet applying its savings calculation." ECF No. 127 at 3 (italics added). Even if this were the case, EPIC could have pled a claim for breach

12

of the NDA on information and belief, as it did elsewhere in its complaint and amended complaint. See ECF No. 1 at ¶ 6; ECF No. 8 at ¶¶ 6-10 (making allegations based upon information and belief); see, e.g., La Liberte v. Reid, No. 18-CV-5398 (DLI) (JRC), 2023 WL 6593985, at *5 (E.D.N.Y. Aug. 18, 2023), adopted by, 2023 WL 6370772 (E.D.N.Y. Sept. 30, 2023) (denying leave to amend for lack of good cause where "plaintiff could have made further allegations upon information and belief"); Sidman v. Concord Arena Parking, LLC, No. 15-CV-07426 (CBA) (SJB), 2022 WL 912753, at *4 n.6 (E.D.N.Y. Mar. 29, 2022) (denying motion to amend for lack of good cause where "even by [d]efendants' own account, they only state that they had no conclusive evidence" regarding their claim, "not that they lacked knowledge altogether") (underlining in original).

Further, in its prior complaints EPIC alleged that PPD had disclosed "claims analysis[] and other associated confidential and proprietary information" in violation of the Consulting Agreement. ECF No. 1 at ¶ 34; ECF No. 8 at ¶ 38. But the plain terms of the confidentiality provision in the Consulting Agreement did not protect such EPIC information from disclosure. Instead, the confidentiality provision in the Consulting Agreement protected EPIC only from disclosure by PPD of the Consulting Agreement. See ECF No. 29-1 at § 13 ("[T]his Agreement and its terms and conditions are confidential, and contain confidential and proprietary information of both [EPIC] and [PPD]," and "[n]either [EPIC] nor [PPD] shall disclose copies of this Agreement to any party for any purpose without the prior written consent of the other party."). The remaining protections afforded by the confidentiality provision benefited only PPD, protecting PPD from disclosure by EPIC of PPD's confidential information. See id. The provision provides that "any and all information which may be made available to or learned by [EPIC] from [PPD] . . . is to be treated by [EPIC] as strictly confidential" and "shall not be

13

published or disclosed to any third parties except to provide the Services other than to [EPIC's] officers, directors, affiliates, advisors (including attorneys), agents, employes or subcontractor[s]." Id. The provision thus did not protect EPIC from PPD's disclosure of EPIC's confidential information. As such, any confidential information beyond the Consulting Agreement that EPIC alleged in its amended complaint was improperly disclosed by PPD—that is, "claims analysis[] and other associated confidential and proprietary information" (ECF No. 1 at ¶ 34; ECF No. 8 at ¶ 38)—would necessarily have been information that was protected from disclosure by the NDA, because the Consulting Agreement afforded no such protection. And EPIC cannot claim that it was unaware of the NDA. It has had the NDA and the Consulting Agreement since June of 2019. ECF No. 29-1 at 9; ECF No. 125-2 at 2.

In short, based on the allegation in its complaint and amended complaint and the language of the confidentiality provisions in the Consulting Agreement and NDA, EPIC should have known that it had a claim for breach of the NDA long before it filed its motion for leave to amend in August 2025. EPIC should have been aware of the existence of the claim when it filed its complaints alleging that PPD shared "claims analysis[] and other associated confidential and proprietary information to at least one competitor of Plaintiff without Plaintiff's consent." See ECF No. 1 at ¶ 34; ECF No. 8 at ¶ 38. Consequently, EPIC has not shown good cause for its untimely motion. See, e.g., Vyas v. Taglich Bros., Inc., No. 23-CV-8104 (AT) (KHP), 2023 WL 8810516, at *4 (S.D.N.Y. Dec. 20, 2023) (denying leave to amend for lack of good cause where plaintiff based its amendment on "production of a document merely confirming what is already alleged in the operative complaint"); Moore v. Publicis Groupe SA, No. 11-CV-1279 (ALC) (AJP), 2013 WL 4483531, at *8 (S.D.N.Y. Aug. 23, 2013), adopted sub nom. by, Moore v. Publicis Grp. SA, 2013 WL 5951903 (S.D.N.Y. Oct. 30, 2013) (denying motion to amend where

14

"the recent [ ] discovery may have provided some additional support for the proposed new claims, but certainly it was not the primary basis" because plaintiffs had access to enough information "long before [ ] discovery began, let alone ended"); Levin v. Johnson & Johnson, No. 16-CV-6631 (GRB) (AYS), 2021 WL 9553623, at *4 (E.D.N.Y. Jan. 11, 2021) (denying leave to amend where plaintiff was aware of the relevant facts before filing his complaint and "even included quotes from [the relevant document] in the Second Amended Complaint," but "the fact that he didn't necessarily understand its importance until fairly recently does not justify good cause under Rule 16").

Moreover, PPD would be prejudiced if leave to amend were granted. "Prejudice may exist, *inter alia,* when the amendment would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute.'" Azkour v. Haouzi, No. 11-CV-5780 (RJS) (KNF), 2012 WL 3667439, at *2 (S.D.N.Y. Aug. 27, 2012) (quoting Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 284 (2d Cir. 2000)). "Where a motion for summary judgment is pending and/or discovery has closed, Courts regularly find prejudice to the non-movant and deny leave to amend." Guity v. Uniondale Union Free Sch. Dist., No. 12-CV-1482 (SJF) (AKT), 2014 WL 795576, at *8 (E.D.N.Y. Feb. 27, 2014). Here, discovery closed on May 17, 2025, and the parties are otherwise ready for a second round of dispositive motion practice or trial. See, e.g., Wilcox v. Cornell Univ., 868 F. Supp. 2d 186, 187 (S.D.N.Y. 2012), aff'd by, No. 11-CV-8606 (BSJ) (AJP), 2012 WL 4903181 (S.D.N.Y. Oct. 10, 2012) (denying motion to amend complaint as prejudicial "because it would require the reopening of discovery after defendants have spent time and resources conducting discovery and preparing to file their summary judgment motion").

15

Additionally, if leave to amend were granted, discovery would need to be reopened to address the NDA and the disclosure of documents subject to the confidentiality provision in that agreement, topics which were not previously the subject of discovery by the parties. See, e.g., iMedicor, Inc v. Access Pharms., Inc., 290 F.R.D. 50, 54 (S.D.N.Y. 2013) (denying motion to amend where "[r]e-opening discovery will cause significant delay in the resolution of those claims and the resolution of the action as a whole"); Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd., No. 11-CV-726 (CBA), 2012 WL 2458060, at *8 (E.D.N.Y. June 27, 2012), aff'd by, 2012 WL 3306612 (E.D.N.Y. Aug. 13, 2012) (denying motion to amend where "defendants (and the Court) would certainly suffer some prejudice by the filing of an amended complaint this late in the proceeding, as that would necessarily prolong the resolution of the case").

2. EPIC's breach-of-contract claim is futile.

Even if EPIC were able to establish good cause to amend the complaint, EPIC nevertheless fails to state a viable breach-of-contract claim based on a breach of the confidentiality provision in the NDA. PPD contends that its confidentiality obligations were governed by the Consulting Agreement, not the NDA, and that the confidentiality provision in the NDA was "expressly superseded" by the confidentiality provision in the Consulting Agreement. See ECF No. 122 at 11-13. Conversely, EPIC argues that the NDA is not superseded by the Consulting Agreement, because the confidentiality provisions in the NDA and the Consulting Agreement "focus on separate topics." ECF No. 125 at 6.

"Under New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522, 526 (2d Cir. 2011) (internal quotation marks, alteration, and citation omitted). "In determining whether a subsequent contract regards the same subject matter,

16

courts consider: (1) whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded; (2) whether the two provisions have the same general purpose or address the same general rights; and (3) whether the two provisions can coexist or work in tandem." Diamond v. Triller Grp., Inc., No. 25-CV-129 (PAE), 2025 WL 2171800, at *6 (S.D.N.Y. July 31, 2025) (internal quotation marks and citation omitted). "A subsequent contract not pertaining to precisely the same subject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 809-10 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

Beginning with the first factor, the Consulting Agreement contains a merger clause which states: "This Agreement supersedes all prior understandings, representations, negotiations and correspondence between the parties, constitutes the entire agreement between them with respect to the matters described[.]" ECF No. 29-1 at ¶ 12(F). Even though the merger clause does not specifically reference the NDA, where a merger clause contains language indicating that "all prior understandings" are superseded, courts have concluded that such language suffices to demonstrate an intent to replace and supersede any prior agreement or understanding between the parties. See, e.g., Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc. No. 16-CV-2767 (GBD), 2019 WL 1649983, at *7 (S.D.N.Y. Mar. 28, 2019) (agreement with merger clause that stated it "supersede[d] all other prior oral or written agreements between the [parties] . . . and contain[ed] the entire understanding of the parties with respect to the matters covered in [the agreement]" superseded prior NDA where "the language clearly evidences the parties' intent to displace all 'prior oral or written agreements,' including the NDA, with the more nuanced terms of the SPA"); Medtech Prods. Inc., 596 F. Supp. 2d at 810-11 (concluding that confidentiality

17

provisions in prior agreement superseded by new agreement which stated that the agreement

"supersedes and replaces any and all other written or oral exchanges, agreements,

understandings, arrangements, or negotiations between or among them relating to the subject

matter hereof"); Thales Alenia Space France v. Thermo Funding Co., LLC, No. 13-CV-712

(SAS), 2014 WL 3887711, at *4 (S.D.N.Y. Aug. 7, 2014) (settlement agreement superseded

prior release agreement where the settlement agreement stated that it "supersedes all prior

understandings, commitments and representations between the Parties with respect to the subject

matter hereof") (internal quotation marks and citation omitted).

Turning to the second factor, the confidentiality provisions of the NDA and Consulting

Agreement relate to the same general purpose. The NDA, which was executed on June 14, 2019,

states that it involves the discussion of "consulting services pertaining to employee benefit plans

that [EPIC] may offer to PPD[.]" ECF No. 125-2 at 2. That provision only permits disclosure of

confidential information to the recipient's "officers, directors, employees, advisors (including

attorneys), agents, and othe[r] representatives . . . who have a need to know and who are bound

by the confidentiality obligations." Id. at ¶ 2. The Consulting Agreement, which was executed on

or about June 19, 2019, states that "[PPD] wishes to obtain the assistance of [EPIC] with

strategic benefit planning, design, funding, administration, and communication with respect to its

employee benefit programs" and "[EPIC] will provide [PPD] with consulting services." ECF No.

29-1 at 2. The confidentiality provision in the Consulting Agreement protects "any and all

information which may be made available to or learned by [EPIC] from [PPD]" and "shall not be

published or disclosed to any third parties except to provide the Services other than to [EPIC's]

officers, directors, affiliates, advisors (including attorneys), agents, employees or

subcontractor[s]." ECF No. 29-1 at ¶ 13. As is evident from the text of both agreements, both the

NDA and the Consulting Agreement concern the parties' confidentiality obligations regarding EPIC's engagement as a consultant for PPD in connection with employee benefit plans.

EPIC contends that the two agreements do not relate to the same subject matter and "focus on separate topics." ECF No. 125 at 5-6. Specifically, EPIC argues that the NDA sets out the "general confidentiality requirements of the parties," whereas the Consulting Agreement "includes confidential provisions for certain information related to the Consulting Agreement." Id. at 5. But this is not the case: both the NDA and Consulting Agreement contain broad definitions of confidential information. The NDA defines "Confidential Information" as "any and all material, data, know-how and information of any kind whatsoever, provided to Receiving Party by Disclosing Party, or on behalf of Disclosing Party, or discovered by Receiving Party as a result of Receiving Party's relationship with Disclosing Party." ECF No. 125-2 at ¶ 1. The Consulting Agreement defines "Confidential Information" as "any and all information which may be made available to or learned by [EPIC] from [PPD] or any of its subsidiaries and affiliates during the Term of this Agreement." ECF No. 29-1 at ¶ 13. Both agreements thus address what may and may not be disclosed by the parties regarding EPIC's engagement as a consultant for PPD. And although the Consulting Agreement covers only confidential information shared by PPD—whereas the NDA covers confidential information shared by both parties—both agreements have the same general purpose: confidentiality of information shared in connection with EPIC's engagement as a benefit-plan consultant for PPD. See, e.g., Diamond, 2025 WL 2171800, at *6 (finding new agreement superseded old agreement where both address the terms of service of chairman of the board even where they "materially differ[ed]" in two respects). Under such circumstances, courts have concluded that two agreements cover the same subject matter. See Medtech Prods. Inc., 596 F. Supp. 2d at 793 (finding agreements covered the

19

same subject matter where they both address "confidentiality owed to [plaintiff], both during and after [defendants'] respective engagements with [plaintiff]"); Dewitt Stern Grp., Inc. v. Eisenberg, 257 F. Supp. 3d 542, 582 (S.D.N.Y. 2017), aff'd by, 734 F. App'x 48 (2d Cir. 2018) (agreements covered same topic where they "address the same topic, [defendant's] employment conditions while at [plaintiff corporation], and the agreements contain the same subjects, like compensation, termination, and indemnification"); cf. Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc., No. 20-CV-78 (PAE), 2021 WL 1199430, at *5 (S.D.N.Y. Mar. 30, 2021) (agreements did not concern same subject matter where original agreement related to permanent placement of employees and new agreement related to temporary placement of employees); Stewart v. Target Corp., No. 11-CV-3557 (DLI) (RER), 2013 WL 1182080, at *4 (E.D.N.Y. Mar. 20, 2013) (finding new agreement that concerned marketing and advertising of the product was not superseded by old agreement that covered purchase and delivery of the product).

EPIC notes that it also executed a Business Associate Agreement ("BAA") in June 2019, around the same time as it executed the NDA and Consulting Agreement, which covered the use of Protected Health Information under the Health Insurance Portability and Accountability Act ("HIPAA"). ECF No. 125 at 5; see also ECF No. 117-2.[3] EPIC points to the BAA to argue that it would be "ridiculous" for only the provisions of the Consulting Agreement to survive based on the order in which the agreements were executed. ECF No. 125 at 5-6. But this only underscores that an earlier agreement must relate to the same subject matter to be superseded by a later agreement. The BAA concerns the disclosure of different information: Protected Health Information under HIPAA. The BAA does not apply to the disclosure of confidential and

---

[3] EPIC did not file an executed version of the BAA. There thus is no evidence in the record establishing when the BAA was executed. See ECF No. 117-2 at 5.

proprietary *business information*, which is addressed by both the NDA and Consulting Agreement.

EPIC also argues that because the agreements are part of the same underlying transaction, they must be read together and "it would be entirely illogical for the merger clause of one to negate the other." ECF No. 117 at 7-8. In considering whether multiple agreements should be read together, courts have considered whether "the second contract required the parties to 'honor all of the terms and conditions set forth in the [first]," among other factors. Geller Biopharm, Inc. v. Amunix Pharms., Inc., No. 20-CV-4334 (JPC), 2021 WL 4155015, at *5 (S.D.N.Y. Sept. 13, 2021) (quoting TVT Recs. v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005)) (alteration in original). In cases where courts have concluded that two agreements should be integrated, there was specific language indicating integration, or language indicating that one contract was relying on another. See, e.g., Evolution Markets, Inc. v. Roeslein Alternative Energy, LLC, No. 17-CV-3474 (KBF), 2018 WL 3946445, at *4 (S.D.N.Y. Aug. 16, 2018) (finding agreements integrated where contract referenced separate agreement and stated they "shall form a single integrated agreement between the parties") (emphasis omitted); iSentium, LLC v. Bloomberg Fin. L.P., No. 17-CV-7601 (PKC), 2020 WL 248939, at *5 (S.D.N.Y. Jan. 16, 2020) (finding NDA incorporated into subsequent agreement where subsequent agreement contained express incorporation provision and agreements had "parallel provisions" regarding confidentiality); see also Genger v. Genger, 76 F. Supp. 3d 488, 497 (S.D.N.Y. 2015), aff'd, 663 F. App'x 44 (2d Cir. 2016) (finding agreements integrated where "neither agreement makes any sense without the promises expressed in the other").

Here, the Consulting Agreement does not contain an integration clause of any kind, and it does not contain any language referencing the NDA or suggesting that the Consulting Agreement

21

relied on the NDA. See, e.g., Rosen v. Mega Bloks Inc., No. 06-CV-3474 (LTS) (GWG), 2007 WL 1958968, at *5 (S.D.N.Y. July 6, 2007), adopted in part by, 2008 WL 2810208 (S.D.N.Y. July 21, 2008) (rejecting argument that agreements executed at the same time had to be read together because "[t]he mere fact that a document is an 'integral part' of a larger transaction does not mean that any provision contained in that document must be applied to all other documents that are part of the same transaction," and "[n]or is it dispositive that the contractual documents were all executed at the same time," because "[p]arties are free to enter into multiple contracts as part of a single transaction without the provisions in one contract governing another contract"). Instead, the Consulting Agreement contains a "Complete Agreement" clause which states that the agreement "supersedes all prior understandings, representations, negotiations and correspondence between the parties" and "constitutes the entire agreement between them with respect to the matters described." ECF No. 29-1 at § 12(F).

"Where both agreements relate to the same subject matter, and there is a facially unambiguous merger clause, the Court is bound to interpret the later agreement as superseding the earlier." Diamond, 2025 WL 2171800, at *7; see also Thales Alenia Space France, 2014 WL 3887711, at *4 ("If these sophisticated Parties intended to continue the obligations under the [prior agreement], they could and would have so provided."). Here, because the two agreements concern the same subject matter and the Consulting Agreement contains an unambiguous merger clause, the Court need not examine whether the third factor (whether the agreements can coexist) is also satisfied. See Diamond, 2025 WL 2171800, at *7 (concluding that later agreement superseded earlier agreement without examining third factor where agreements concerned same subject matter and later agreement contained a merger clause). Consequently, EPIC's breach-of-contract claim under the NDA is futile because the parties' confidentiality obligations were

22

governed by the Consulting Agreement, not the NDA. See, e.g., BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp., 716 F. Supp. 3d 206, 222 (S.D.N.Y. 2024) (noting "if the [prior agreement] is superseded, then [plaintiff] cannot sustain a claim for breach of that agreement"); Diamond, 2025 WL 2171800, at *7 (concluding that plaintiff could not bring a claim under old agreement where it was superseded by new agreement).

In sum, EPIC has not demonstrated good cause to obtain leave to amend the complaint at this stage of the case. Good cause aside, EPIC's proposed breach-of-contract claim is futile for the reasons discussed herein.

## CONCLUSION

For the foregoing reasons, EPIC's motion for leave to amend is **DENIED**. The parties are directed to file a joint letter indicating whether they intend to move for summary judgment or proceed with a trial on Count II by **April 3, 2026**. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 116.

**SO ORDERED.**

DATED:    New York, New York
            March 23, 2026

_____
VALERIE FIGUEREDO
United States Magistrate Judge

23